UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
AT CINCINNATI

JEREMY ANDERSON,

               Plaintiff,

      v.                                Case No. 1:11-cv-912-HJW

PROCOPY TECHNOLOGIES, INC.,
dba PROSOURCE

               Defendant

## ORDER

Pending is the defendant's "Motion for Summary Judgment" (doc. no. 22), which plaintiff opposes. Defendant has submitted proposed findings of fact and conclusions of law, which plaintiff has highlighted as true, false, or irrelevant (doc. no. 34). The Court held a hearing on May 14, 2014, at which counsel presented oral arguments. Having carefully considered the record, including the parties' briefs, exhibits, proposed findings, oral arguments, and applicable authority, the Court will <u>grant</u> the motion for the following reasons:

## I. Background and Procedural History

ProCopy Technologies, Inc. ("ProSource") is a small Ohio company that sells copy machines.[1] ProSource hired Jeremy Anderson for the position of "warehouse clerk" ("Proposed Findings," doc. no. 34, ¶ 5). He started working there on December 1, 2008 and was the only warehouse clerk in the warehouse (¶ 5). He reported to the logistics manager Dale Schneider, who supervised the

---

[1] Plaintiff red-lined as "disputed" various facts in the Proposed Findings that were correct because he was disputing the legal implications of those facts, not the facts themselves.

warehouse (¶ 7). Anderson's resumé indicated he had prior experience operating a forklift (doc. no. 25-2 at 2). ProSource sent Anderson for additional forklift training during his first week on the job, and he obtained a forklift operating permit on December 9, 2008 (Proposed Findings, doc. no. 34, ¶ 9; see also, doc. no. 25-5, Portman Training Center, "Operator Safety Training" class). In addition to keeping computerized inventory and warehouse records, Anderson's responsibilities included unloading copiers from arriving trucks, putting the copiers in the warehouse in stacks up to twenty feet high, and pulling them from the stacks for delivery to customers (And. Dep. at 99-100, 283; see also, Ex. 9 ProSource job description). He drove a forklift 3-4 days of each week (Proposed Findings, doc. no. 34, ¶ 10), and by his own estimate, used a forklift for approximately 7.5 hours each week (doc. no. 35-1, And. Declaration, ¶ 10). He received additional on-the-job training on driving, deliveries, and the paperwork required for deliveries (And. Dep. at 148).

During 2009, ProSource was short several delivery drivers (And. Dep. at 144-45, indicating "In spring 2009, Craig left. In fall, Doug left."). Beginning in January 2010, Anderson began serving as a back-up driver (And. Decl., ¶ 5; see also, And. Dep. at 116 "I would do some deliveries"). He began attending drivers' meetings (Id. at 152-153, 284 "Q. At this point, you were attending drivers' meetings; is that true? A. Yes."). In April of 2010, he signed a document entitled "New Employee Set Up Sheet" (doc. no. 25-14), which listed his job as "driver/warehouse" and indicated he was being given a company cell phone in

connection with such position (Proposed Findings, doc. no. 34, ¶ 13). Anderson acknowledges that in 2010 he was doing "deliveries on a back-up basis" in addition to his warehouse duties (doc. no. 35-1, And. Decl. ¶ 5). The number of drivers fluctuated during this time period, but ProSource hired several more drivers that year and generally had 3-4 people for deliveries (And. Dep. at 150, indicating that by spring 2010, ProSource had four drivers). As a back-up driver in 2010, Anderson made deliveries between January and May 27, 2010, on 29 days to over 60 locations/customers (doc. no. 25-16 at 1-36).[2]

ProSource kept written records of its deliveries, including the names of the drivers/assistants who made the deliveries, the names and locations of the customers, the "in/out" time for the delivery and service, the vehicle mileage, and other pertinent information (Proposed Findings, doc. no. 34, ¶ 16). Plaintiff does not dispute that these records are generally accurate (And. Dep. at 269, "Q. If your name does not appear on a delivery log, is that ordinarily an indication that you were not on that delivery? A. Correct."). Plaintiff has submitted nearly 700 pages of delivery records for the various drivers (doc. no. 35, Ex. B, Parts I-VII).

In late May 2010, Anderson told his supervisor that he could not drive at all due to a diagnosed medical condition ("epilepsy") (And. Dep. at 185 and Ex. 17).[3] He also told Melanie Hyden in the HR department (And. Dep. at 186 "I had a note

---

[2] Most of these deliveries were made by "Jeremy" solo. Only four days (January, 25, 28, 29, and April 16) involved two-person deliveries by "Jeff and Jeremy."

[3] Anderson indicates he started taking seizure medication on May 14, 2010 (And. Dep. at 203).

with me and I went to her office and informed her of the situation."). He acknowledges that he had experienced "a few" seizures at work (Id. at 203). Anderson gave his employer a doctor's note, dated May 27, 2010, restricting him from driving (Id. at 189). [4] In the note, Dr. Sheetal Malik, M.D., indicates "Mr. Anderson may not drive a motor vehicle until he completes his evaluation/testing and has his follow up in the office to discuss the results on 6/11/10" (doc. no. 25-17, doctor's note).

As Anderson was temporarily restricted from driving delivery vehicles and from operating a forklift, ProSource had him continue doing the parts of his job that he could still do, such as keeping warehouse records on the computer and moving any ground-level machines with a manual jack. ProSource also utilized him as a non-driving assistant in some two-person deliveries (Kimberly Dep. at 33 "It was more efficient to send one person than to send two" but indicating that some deliveries needed two people). ProSource had Ricky Kimberly (a summer employee who stayed and did not return to college) drive the delivery truck, with Jeremy assisting (doc. no. 25-16 at 36-68, records of "Ricky + Jeremy" deliveries from May 27 to August 10, 2010). During this time period, these two employees made deliveries on 20 days to approximately 50 different locations/customers. As Anderson was medically restricted from operating the forklift, he could not unload

---

[4] Although plaintiff red-lined as "disputed" the fact that "the doctor's note is dated May 27, 2010" (Proposed Findings, doc. no. 34, ¶ 15), the exhibit in the record reflects such date (doc. no. 25-17). At the hearing, plaintiff could not explain why he had "disputed" this fact.

any double-stacked copy machines from arriving trucks, nor could he stack them in the warehouse. In order to pull orders for copier machines that were stacked in the warehouse, ProSource had to have other employees operate the forklift. This was in addition to their own jobs. ProSource had to pay employees overtime in order to cover Anderson's duties in the warehouse that required the use of a forklift (Siefert Dep. at 120). When he needed to get copiers ready for delivery to customers, Anderson was able to use a "hand-jack" to move any copiers that were at ground level.

Anderson suggested to ProSource that his restriction was only temporary. On June 11, 2010, he sent an email to Chris Shersky, VP at ProSource, advising that "I still cannot drive; however, at this time it's just for a few weeks and I will get another EEG performed on June 25th and hopefully I will be able to resume normal duties" (doc. no. 25-20 email; And. Dep. at 214, Q. [I]s that what you wrote to Chris? A. Yes.). His hope that his medical restriction would last for only "a few weeks" did not work out. On June 24, 2010, a second letter from Dr. Malik indicated that Anderson was still "restricted from operating a motor vehicle and other heavy machinery until further notice" (Proposed Findings, doc. no. 34, ¶ 21; doc. no. 25-19, letter). On July 13, 2010, Dr. Malik again indicated that Anderson was "unable to drive at this time. He will be re-evaluated on August 13, 2010" (doc. no. 25-21, letter). On August 16, 2010, Dr. Malik once again indicated that Anderson was "unable to drive at this time. He will be re-evaluated" on August 23, 2010 (doc. no. 25-22, letter). When that date arrived, ProSource was given a doctor's note

indicating that Anderson "is not to drive until further notice. He has a follow up appointment on 10-22--2010" (doc. no. 25-23).[5] As the doctor's note indicated that Anderson was not cleared to drive a truck or operate a forklift for at least another three months, ProSource placed him on FMLA leave on August 24, 2010 and sent him home (Proposed Findings, doc. no. 34, ¶ 28; see also, And. Dep. at 224 "Q. Did [HR] tell you why? A. Because I couldn't drive and they needed me to drive."). The FMLA certification by Anderson's health care provider indicated that the "duration" of plaintiff's epilepsy was "chronic" and that he was restricted from operating any heavy machinery or driving vehicles (doc. no. 25-24).

On September 12, 2010, Anderson sent an email to Melanie Hyden, HR Director, indicating that he did not want to be on FMLA leave and would not be submitting the paperwork she had provided (doc.no. 25-26). He indicated that he wanted to continue working "as I was before August 24th." Ms. Hyden then asked him to meet in order to discuss the matter. At the meeting with Hyden and Chris Shersky (Vice-President of ProSource) on September 30, 2010, Hyden reminded Anderson that he was on FMLA leave for a serious medical condition and could not drive. Anderson insisted that he did not want to be on FMLA leave. He "informed" them that in his opinion he could do his job with a hand jack,[6] but they indicated that he could not do the essential functions of his job with such manual

---

[5] The letter is unsigned, but on letterhead for "Riverhills Healthcare: Neurology, Neurosurgery, Pain Management, and MR Imaging." Its authenticity is not disputed.

[6] The parties interchangeably refer to this device as a hand-jack or pallet-jack.

device (And. Dep. at 232-33 "I remember Chris telling me that I was not able to do my job with a pallet jack"). They advised Anderson that the medical documentation reflected that he continued to be restricted from driving vehicles or operating forklifts. Anderson acknowledges he did not request any sort of accommodation from ProSource (And. Dep. at 241-242 Q. At any time, did you ask ProSource for any accommodation for your job? A. I do not believe so."). Chris Shersky indicated he hoped Anderson would return to work there and encouraged him to reapply (Shersky Dep. at 33 "I wanted him to get better. . . we wanted him to come back to work for us").

On October 6th, HR Director Hyden sent an e-mail to Anderson reiterating that "your FMLA leave started on 8/24/2010 and . . . you are on FMLA leave until you can perform the essential duties of your position" (doc. no. 25-29). She reminded Anderson of his rights and obligations under the FMLA. In the email, Hyden indicated that "ProSource has no current vacant positions for which you are qualified," but encouraged him to reapply later on. Anderson acknowledges that he never applied for any other position at ProSource (And. Dep. at 246, "Q. Did you at any point apply for any other open positions at ProSource either while you were an employee there or afterwards? A. No;" and at 250, "Q. So you never applied for a different position at ProSource? A. No.").

When his FMLA leave expired on November 17, 2010, Anderson was still not medically cleared to drive. ProSource determined that he could not do certain essential functions of his job and terminated his employment. Anderson

admittedly did not contact ProSource again after that date (Proposed Findings, doc. no. 34, ¶ 36; And. Dep. at 239, "Q. Did you ever have any contact with ProSource after November 18, 2010? . . . A. I do not believe so."). His doctor did not release him to drive until the following year in April of 2011.

Meanwhile, in October of 2010, Anderson filed an EEOC charge alleging "disability discrimination" under the ADA (doc. no. 25-32, copy of charge date-stamped October 20, 2010). He received a "right to sue" letter from the EEOC (doc. no. 46-1, "Dismissal and Notice of Rights," mailed on September 23, 2011).[7] He filed suit on December 23, 2011. In his First Amended Complaint, plaintiff brings claims pursuant to 42 U.S.C. § 12112 ("ADA") (Count One) and Ohio R.C. §§ 41212.02 and 4112.99 (Count Two) (doc. no. 8). After the completion of discovery, ProSource moved for summary judgment. Anderson responded, and ProSource replied. This matter is fully briefed and ripe for consideration.

## II. Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no genuine dispute of material fact exists. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The court must construe the evidence and draw all

---

[7] The ADA requires a plaintiff to exhaust administrative remedies by filing a charge with the EEOC and receiving a right to sue letter. 42 U.S.C. § 12117(a). The parties do not dispute any timeliness issues.

reasonable inferences in favor of the nonmoving party. Id. at 587. In doing so, courts must distinguish between evidence of disputed material facts and mere "disputed matters of professional judgment," i.e. disagreement as to legal implications of those facts. Beard v. Banks, 548 U.S. 521, 529-30 (2006).

On summary judgment review, the court must determine whether the evidence presents a sufficient dispute of material fact so as to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Id. at 248. A mere scintilla of evidence in support of a party's claim is insufficient to survive summary judgment, as there must be enough evidence that a jury could reasonably find for the party. Id. at 251. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III. Relevant Statutes

Title I of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112, and the Ohio Civil Rights Act, at R.C. § 4112.02, both prohibit employment discrimination and retaliation against disabled persons with respect to discharge or other terms, conditions, and privileges of employment. The ADA, as amended, prohibits discrimination "against a qualified individual on the basis of disability."

42 U.S.C. § 12112(a).[8] The ADA defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." Id. at § 12112(b)(5)(A). Under the ADA, the plaintiff must show that his disability was a "but for" cause of his termination. Lewis v. Humboldt Acquisition Corp., Inc., 681 F.3d 312, 315 (6th Cir. 2012) (en banc).

Similarly, Ohio R.C. § 4112.02(A) provides:

> "It shall be an unlawful discriminatory practice "[f]or any employer, because of the ... [disability] ... of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."

Given the similarity of the statutes, Ohio courts have repeatedly held that a court considering an Ohio disability discrimination claim may look to federal case law interpreting the ADA for guidance. See Columbus Civil Serv. Comm. v. McGlone, 82 Ohio St.3d 569, 573 (1998); Chiancone v. City of Akron, 2014 WL 1423266, *3, ¶ 16 (Ohio App. 9 Dist.). The analysis is largely the same under both statutes, and resolution of a plaintiff's ADA claim will, in most instances, resolve the Ohio claim as well. See Jakubowski v. The Christ Hospital, 627 F.3d 195, 201 (6th Cir. 2010), cert. denied, 131 U.S. 3071 (2011); Bibee v. Gen. Revenue Corp., 991 N.E.2d 298, 301 (Ohio App. 1 Dist. 2013); Taylor v. Ohio Dept. of Job & Family

---

[8] Congress amended the ADA in 2008 to replace its "because of" language with "on the basis of" language. ADA Amendments Act of 2008, Pub.L. No. 110-325, 112 Stat. 3553. Such amendment was effective on January 1, 2009, see Milholland v. Sumner Cty. Bd. of Educ., 569 F.3d 562, 566-67 (6th Cir. 2009), and apples here, as plaintiff's termination occurred after such date.

<u>Servs</u>., 2011 WL 5878335, ¶18 (Ohio App. 10 Dist.); <u>Bresser v. Total Quality</u> <u>Logistics</u>, 2014 WL 1872113, *5 (S.D.Ohio). The parties have not argued any pertinent differences between the statues in their briefs or at oral argument. Here, the analysis and determination of plaintiff's ADA claim will also apply to his state law claim.

## IV. Discussion

## A. The Disability Discrimination Claim

Under the ADA, employers are prohibited from discriminating against a qualified employee with a disability on the basis of that disability by "not making reasonable accommodations to the known physical or mental limitations of [that employee] ..., unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(a), (b)(5)(A). See also, 29 C.F.R. § 1630.2(o)(4) (an employer is "required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual who meets the definition of disability...."). Under the ADA regulations, the term "qualified" means "that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

Anderson alleges that ProSource "failed to accommodate" him and terminated his employment. As ProSource correctly indicates (doc. no. 40 at 4),

such claims are properly analyzed as involving direct evidence. <u>Kleiber v. Honda of Am. Mfg., Inc.</u>, 485 F.3d 862, 868 (6th Cir. 2007) ("claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence"). Such claims are analyzed under the following framework:

> (1) The plaintiff bears the burden of establishing that he is disabled. (2) plaintiff bears the burden of establishing that he is "otherwise qualified" for the position despite his disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

<u>Id</u>. 869 (citing <u>Hedrick v. W. Reserve Care Sys.</u>, 355 F.3d 444, 452 (6th Cir.), cert. denied, 543 U.S. 817 (2004)). An undue hardship has been described as "a significant difficulty or expense" (doc. no. 35-3 at 5-6, EEOC materials submitted by plaintiff).

The parties do not dispute that Anderson has epilepsy and that he was medically restricted from driving vehicles and operating forklifts. For purposes of summary judgment, the parties assume that such condition qualifies as a disability under the ADA.[9] See 42 U.S.C. § 12102(4)(D) ("an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active"); 42 U.S.C. § 12102(4)(A) (indicating that the definition of

---

[9] Anderson's assertion that ProSource "concedes" the issue is not quite accurate. More precisely, ProSource indicates that "only for purposes of this motion, it is assumed Anderson had a disability" (doc. no. 40 at 4).

disability "shall be construed in favor of broad coverage of individuals").[10] The parties focus their arguments on the remaining steps.

Even assuming that Anderson's epilepsy was a disability for purposes of the ADA, his claim fails because he acknowledges that he *never requested* any accommodation, much less any reasonable accommodation (And. Dep. at 241-242 "Q. At any time, did you ask ProSource for any accommodation for your job? A. I do not believe so."). A plaintiff must propose an accommodation and show that it is objectively reasonable. <u>Kleiber</u>, 485 F.3d at 870-71; <u>Johnson v. Cleveland City School Dist</u>., 443 Fed.Appx. 974, 983 (6th Cir. 2009). Plaintiff did not do so. He merely demanded that he be allowed to do the non-driving part of his job while transferring certain essential functions of his job to other employees. The ADA does not require this.

It is well-settled that the ADA does not require employers to accommodate individuals by shifting an essential job function onto others. See 29 C.F.R. pt. 1630, App. § 1630.2(o) ("An employer or other covered entity is not required to reallocate essential functions [since] ... the assistant would be performing the job for the individual with the disability rather than assisting the individual to perform

---

[10] While Anderson did not drive a semi-trailer that required a CDL license, it is worth noting that federal regulations prohibit anyone with an "established medical history or clinical diagnosis of epilepsy" from driving commercial vehicles in interstate commerce. See Federal Motor Carrier Safety Act, 49 U.S.C.A. § 31131 et. seq.; 49 C.F.R. § 391.41(b)(8); see also, <u>Ward v. Skinner</u>, 943 F.2d 157, 159 (1st Cir. 1991), cert. denied, 503 U.S. 959 (1992) (affirming DOT's denial of waiver of rule prohibiting anyone with an "established medical history or clinical diagnosis of epilepsy" from driving commercial vehicles in interstate commerce, and observing that "a person is physically qualified to drive a motor vehicle if that person ... [h]as no established medical history or clinical diagnosis of epilepsy").

the job."). The Sixth Circuit Court of Appeals has repeatedly held that "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." Hoskins v. Oakland Cty. Sheriff's Dept., 227 F.3d 719, 729 (6th Cir. 2000); Bratten v. SSI Servs., Inc., 185 F.3d 625, 632 (6th Cir. 1999) ("The only possible accommodation [plaintiff] identifies is allowing co-workers to perform as much as 20% of the essential automotive mechanic duties for Bratten when he needs such assistance.... employers are not required to do so under the ADA."); Wardia v. Justice and Public Safety Cabinet Dept. of Juv. Justice, 509 Fed.Appx. 527, 531 (6th Cir. 2013) (holding that the ADA did not require employer shift essential job functions to other coworkers in order to "accommodate" an employee with a disability). In fact, plaintiff concedes that the "ADA does not require employers to accommodate individuals by shifting an essential job function onto others" (doc. no. 34 at 12, ¶¶ 11, 13).

While the ADA requires job restructuring of *non-essential* duties as a reasonable accommodation in appropriate circumstances, Henschel v. Clare Cty. Rd. Comm'n, 737 F.3d 1017, 1025 (6th Cir. 2013), "the ADA does not demand that an employer exempt a disabled employee from an essential function of the job as an accommodation." Brickers v. Cleveland Bd. of Educ., 145 F.3d 846, 850 (6th Cir. 1998) (granting summary judgment to employer on ADA claim). In Bricker, the Sixth Circuit Court of Appeals emphasized that "[w]hat Brickers requests is not an accommodation, but rather an exemption and, as such, does not survive the threshold determination of whether [he] is a 'qualified individual with a disability'."

14

Id.; see, e.g., Manigan v. SORTA, 2009 WL 174137, *6 (S.D.Ohio) (J. Barrett) (granting summary judgment to employer on ADA claim and observing that "[i]n essence, Manigan seeks an exemption from the eight-hour driving requirement. However, an employer is not required to exempt a disabled employee from an essential function of the job as an accommodation."), affirmed by 385 Fed.Appx. 472 (6th Cir. 2010). If a claimant cannot show that he can perform the essential functions of a given position with or without an accommodation, he is not a "qualified individual with a disability" within the meaning of 42 U.S.C. § 12111(8). See Brickers, 145 F.3d at 846 (finding that "lifting" was an "essential" function of school bus attendant's job and that employee who admittedly could not do this was not "qualified" for the job within the meaning of the ADA).

Although plaintiff suggests that his delivery driving and operation of the forklift were not "essential functions" of his job or were only a "small part" of his job, ProSource points out that it makes little sense for Anderson to contend that his "essential duties did not require driving even though he was a delivery driver and forklift operator" (doc. no. 40 at 1). See Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (finding that plaintiff was precluded from performing the "dangerous machinery functions" required of a particular job, and affirming summary judgment for employer on the state and federal disability discrimination claims) (citing Schuler v. SuperValu, Inc., 336 F.3d 702, 705 (8th Cir. 2003) (affirming dismissal of ADA claim where evidence showed that plaintiff's medical

restriction against driving a forklift precluded him "from performing the functions necessary" for specific warehouse job).

The ADA and regulations provide guidelines for determining if a given function is "essential." See 42 U.S.C. § 12111(8) ("consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job"); 29 C.F.R. § 1630.2(n)(3) (listing seven non-exclusive factors to consider: (1) an employer's judgment that the function is essential; (2) written job descriptions; (3) the amount of job time devoted to performing the function; (4) the consequences of not requiring the employee to perform the function; (5) terms in a relevant labor agreement; (6) the work experience of those who have held the position in the past; and (7) the current work experience of those who hold similar jobs).

In ProSource's judgment, and as reflected in its 2008 job description, unloading copiers (most of which were double-stacked), placing them in stacks in the warehouse, and pulling them from the stacks to fill customer orders were "essential functions" of the warehouse job. The "ProSource Success Profile" (dated 6/9/2008) describes the plaintiff's "warehouse clerk" position (doc. no. 25-9). Under "major goals and responsibilities," it indicates in general terms that the warehouse job involved "receiving all equipment same day and put to stock" (doc. no. 25-9). Under "essential activities," it estimates that the job involved 60%

"manager open order report/working in warehouse," 20% "receiving equipment," (i.e., unloading copiers from trucks and stacking the copiers in the warehouse in stacks up to 20 feet high), and 10% involved "placing order need for open tickets" (i.e. pulling copiers from the stacks in order to fill orders for customers), and 10% "insure warehouse safety and keep it clean."

ProSource asserts, and the evidence reflects, that receiving inventory, "putting it to stock," and pulling double-stacked copiers for customer orders required the use of a forklift. By his own estimate, Anderson indicates he drove the forklift 3-4 days every week and spent "on average" about 7.5 hours weekly using a forklift while doing his job as warehouse clerk, which would be approximately 20% of his work week (And. Decl. ¶ 10; see also, Seifert Dep. at 117 "Q. Do you have any information as to how frequently Mr. Anderson used the forklift during the period of time he was able to? A. He would have to use it on a daily basis if he was pulling equipment from the warehouse to assign orders."). Dale Schneider, Anderson's supervisor, indicates that the amount of forklift time was 50-75% of the warehouse clerk job (Schneider Aff. ¶¶ 4, 14).[11]

Anderson argues that operating a forklift was merely one way to accomplish certain essential functions of the warehouse job and suggests in his brief that he could use a hand-jack ("pallet jack") to accomplish such tasks. He acknowledges, however, that he could <u>not</u> "pull machines that were stacked" without using a

---

[11] Their differing estimates create no genuine dispute of material fact. Even under plaintiff's low estimate, the use of a forklift was required to perform the essential functions of the warehouse job.

forklift (And. Decl. ¶ 9). He acknowledges that pulling orders was a "primary" part of his job (And. Dep. at 283 "Q. [I]f there were orders to be pulled or copiers to be moved in the warehouse, was that one of your prime responsibilities in . . . 2010? A. To do what? Q. Well, to retrieve stock, to get stock, to store things. A. It would be -- My primary would be to pull orders."). The record reflects that unloading, stacking, and pulling copiers for orders were "essential functions" of the warehouse clerk position.

Although plaintiff suggests that he "accommodated himself" by using a manual hand-jack to move any copiers at ground level, this argument fails because he admittedly could not use such manual device to unload, move, or pull orders for any copiers that were stacked. The evidence reflects that copiers typically arrived "double-stacked" on trucks and that most of the copier machines were then placed on warehouse shelving up to 20 feet high in the warehouse (Seifert Dep. at 117, Q. And do you recall how high copiers are stacked in the warehouse? A. They're high up there. I couldn't give you a height. Like 20 feet."). It was plaintiff's job to move such inventory, but he was medically restricted from using the forklift to perform such tasks. Dale Schneider, the logistics manager who supervised the warehouse, indicates that use of a manual hand-jack was not as efficient as using a forklift. Anderson concedes this (And. Dep. at 173-74 " If you're talking about taking one machine from point A to point B on a pallet, then naturally the forklift is faster because it can go quicker."). Schneider indicates that:

> Use of the forklift is required to secure copiers and other equipment/supplies from the racks located above floor grade. A

forklift is also required to empty trucks with big copiers/equipment to the warehouse, as many of the pallets are double-stacked. It is required to use the forklift. The use of a hand fork truck was not a viable substitution or alternative for Mr. Anderson to perform his essential functions as most trucks double-stacked copiers on deliveries to ProSource for warehousing, which required the use of a forklift; most of the copier[s] stored in the warehouse were not stored at ground level; the use of hand trucks was inefficient for the time required to move stock versus the use of an electric/motorized forklift.

(Schneider Aff. ¶¶ 4, 14).

As for the time spent in 2010 as a back-up delivery driver, the records show that Anderson spent approximately 25 days making solo deliveries between January and May 2010. Ricky Kimberly, who eventually was hired for the warehouse clerk/driver position, indicates he spent about 50% of his time driving (Kimberly Dep. at 20 "Q. How much of your time was being spent doing deliveries? A. I would say 50 percent.").

Various employees from other departments had to use the forklift to perform some of plaintiff's job for him (And. Dep. at 98, 106, 118, 137, indicating he would ask other employees, such as Josh Trentman, the set-up supervisor, or Dale Schneider, logistics supervisor). This did not go very well. Jessica Seifert, the scheduler for ProSource, testified other employees complained that they could not get their own work done because they were doing Anderson's job (Siefert Dep. at 115 "Q. What complaints do you recall generally? A. Generally, just having to pull other people from other departments to drive a forklift and take equipment off of the shelves in the warehouse and having to pull time from other departments"). Siefert also testified that employees were "talking about how they couldn't get

deliveries done because no one was in the warehouse to pull equipment." (Id. at 105). When Seifert was asked how orders would get pulled while Anderson was unable to use the forklift, she indicated that "[a]t the end of the day, drivers would work overtime or other people from different departments would pull the equipment" (Id. at 120). In addition to the expense of overtime, she indicated the timing was a problem because "drivers aren't always in-house" (Id. at 122; see also, Shersky Dep. at 21 "it would result in things not getting done on a timely basis").

Although plaintiff argues that the ADA requires employers to consider and to accommodate an employee's disability (doc. no. 35 at 19), ProSource did in fact modify Anderson's duties as a back-up delivery driver so that he did not drive a delivery truck, and instead, assisted in two-man deliveries. As for the warehouse duties that required the use of a forklift for double-stacked copiers, ProSource had to draw other employees from their jobs to use the forklift. The fact that ProSource did not agree that plaintiff could perform his warehouse duties with a hand-jack instead of a forklift does not mean that ProSource somehow failed to engage in an interactive process. ProSource met with Anderson and subsequently indicated by email that, per the discussion at the meeting, they had already explained that ProSource "had accommodated you for a short time, however, the company could no longer do this and operate efficiently" (doc. no. 25-29).

In sum, viewing the evidence and any reasonable inferences in the light most favorable to plaintiff, the evidence reflects no genuine disputes of material

fact, and defendant ProSource is entitled to summary judgment on plaintiff's federal and state claims of disability discrimination.

## B. The Retaliation Claim

Plaintiff also alleges that ProSource "retaliated" against him when it terminated his employment. Under the ADA, an employer may not "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a). Similarly, Ohio's anti-retaliation provision, at R.C. § 4112.02(I), provides that it shall be an unlawful discriminatory practice:

> For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

Where a plaintiff relies on circumstantial evidence of retaliation, the familiar burden-shifting evidentiary framework applies. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Rorrer v. City of Stow, 743 F.3d 1025, 1046 (6th Cir. 2014).

To make a prima facie showing of retaliation, a plaintiff must show that (1) he engaged in protected activity (that was known to the defendant), (2) he suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. Rorrer, 743 F.3d at 1046; E.E.O.C. v. Ford Motor Co., --- F.3d ----, 2014 WL 1584674, *12 (6th Cir. (Mich.)). "Once this showing is made ... the defendant must articulate a legitimate

21

nonretaliatory reason for its action before the burden shifts back to plaintiff to show that the proffered reason was not its true reason but merely a pretext for retaliation." <u>Harris v. Metro. Gov't of Nashville & Davidson Cty</u>., 594 F.3d 476, 485 (6th Cir. 2010). "The burden of persuasion remains with the plaintiff throughout." <u>Id</u>.

It is undisputed that plaintiff filed an EEOC charge, and that ProSource subsequently terminated his employment. The parties dispute causal connection. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." <u>Dixon v. Gonzales</u>, 481 F.3d 324, 333 (6th Cir. 2007). Anderson has not made such showing. He merely assumes his termination was in "retaliation" for his filing an EEOC charge (And. Dep. at 251, "I can only assume what they would think, but from my end, they don't like the fact that they had a charge. They would want to get rid of that."). When asked to identify any facts underlying his claim that he was terminated in retaliation for filing the EEOC charge, Anderson answered "Just the fact that [he believed] they didn't want a charge." (<u>Id</u>. at 254). Mere "conjecture" and "personal belief" are insufficient to withstand summary judgment. <u>Arendale v. City of Memphis</u>, 519 F.3d 587, 605 (6th Cir. 2008) ("In order to survive summary judgment, plaintiff cannot rely on conjecture or conclusory allegations"); <u>Grizzell v. City of Columbus Div. of Police</u>, 461 F.3d 711, 724 (6th Cir. 2006) ("mere personal belief, conjecture and speculation" are insufficient to support an inference); <u>Mitchell v. Toledo Hosp.</u>,

964 F.2d 577, 585 (6th Cir. 1992) ("[C]onclusory allegations and subjective beliefs ... are wholly insufficient ... as a matter of law"); Travelodge Hotels, Inc. v. Govan, 155 Fed.Appx. 235, 237 (6th Cir. 2005) (holding that briefs "filled with conclusory allegations ... failed to present sufficient evidence" to withstand summary judgment).[12]

In his brief, plaintiff devotes less than a page to this claim. He attempts to rely on the fact that his employment was terminated five weeks after filing his EEOC charge (doc. no. 35 at 28). Temporal proximity is usually not enough to show causation. Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 525 (6th Cir. 2008); Spengler v. v. Worthington Cylinders, 615 F.3d 481, 494 (6th Cir. 2010) ("temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim").

"Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection." Randolph v. Ohio Dep't of Youth Servs., 453 F.3d 724, 737 (6th Cir. 2006). For "other indicia," plaintiff suggests that 1) he was on unpaid leave when terminated on November 18, 2010 (and thus, according to plaintiff, there should have been no "urgency" to end his employment); 2) he was fired when his FMLA leave expired, and 3) ProSource had previously expressed hope that he would be released from his

---

[12] Ohio state courts have similarly held that "self-serving statements by the charging party ... are not enough" to withstand summary judgment." Hollowell v. Soc. Bank & Trust, 78 Ohio App.3d 574, 581 (1992); Lascau v. Apex Paper Box Co., 2011 WL 3860508, ¶ 27 (Ohio App. 8 Dist.).

restrictions and return to work for the company, but did not repeat this in the termination letter it sent on November 18, 2010 (doc. no. 36 at 29). Such letter indicated:

> Please consider this letter as formal notification that your employment with ProSource has ended as of 11/17/2010. You have been on FMLA since 08/24/2010 and your 12 week FMLA entitlement has expired as of this week. While you have been on FMLA you have failed to communicate with us as we requested on your status and your release to come back to work. You have also not paid any of your premiums as we outlined in your FMLA paperwork. Based on these facts and your 12 weeks of FMLA expiring, we are terminating your position immediately with ProSource.

(doc. no. 29-1 at 7). This letter was sent over five weeks after plaintiff had filed his charge, which is not particularly close timing. The contents of the letter are factual and unambiguous. See <u>Sosby v. Miller Brewing Co</u>., 415 F.Supp.2d 809, 822 (S.D. Ohio 2005) ("Evidence that an employer had been concerned about a problem before the employee engaged in protected activity undercuts the significance of temporal proximity."), affirmed by 211 Fed.Appx. 382 (6th Cir. 2006).

While courts must draw all inferences in favor of the nonmoving party "to the extent supportable by the record," courts are not obligated to draw unreasonable inferences in a plaintiff's favor on summary judgment review. <u>Scott v. Harris</u>, 550 U.S. 372, 381 n. 8 (2007); see also, e.g., <u>Grubb v. YSK Corp</u>., 2010 WL 4807079, *5-6 (6th Cir. (Ohio)). Plaintiff is asking the Court to draw unreasonable inferences from evidence that does not suggest any causal connection with plaintiff's charge. Plaintiff is essentially suggesting that the *omission* of language about future re-employment in the termination letter can somehow be construed

as evidence of "retaliation." This makes little sense, particularly since the letter plainly states that Anderson had failed to respond to ProSource's previous requests to keep the company apprised of his status. The logical inference to be drawn is that Anderson was no longer interested in returning. Anderson has not pointed to evidence that would raise a reasonable inference of causal connection. See, e.g., Krumheuer v. GAB Robins N. America, Inc., 2012 WL 1700702, *5 (6th Cir. (Ohio)) (finding no "causal connection" for retaliation claim).

ProSource has articulated legitimate reasons for the termination and its timing. ProSource points out that the decision to place Anderson on FMLA leave due to his serious medical condition (and resulting inability to drive) was made in August of 2010. Plaintiff's employment termination in November 2010 coincided with the expiration of his FMLA leave. It is undisputed that plaintiff was not medically cleared to drive at that time. ProSource points out that Anderson admittedly did not advise ProSource about his medical condition while he was on FMLA leave (doc. no. 40 at 14). See Edgar v. JAC Prods., Inc., 443 F.3d 501, 506–07 (6th Cir. 2006) ("an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12–week period of statutory leave"); 29 C.F.R. § 825.214(b) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under the FMLA."). ProSource has sufficiently articulated legitimate, non-discriminatory reasons for the termination

of plaintiff's employment. Anderson has offered no argument or evidence to rebut these legitimate non-discriminatory reasons as pretextual.[13] Summary judgment on the retaliation claim is appropriate.

Accordingly, the defendant's "Motion for Summary Judgment" (doc. no. 22) is <u>GRANTED</u>; plaintiff shall bear the costs of this action. This case is DISMISSED with prejudice and TERMINATED on the docket of this Court.

IT IS SO ORDERED.

<u>      s/Herman J. Weber      </u>
Herman J. Weber, Senior Judge
United States District Court

---

[13] To the extent plaintiff's "causal connection" argument improperly suggests consideration of the firing justifications at the prima facie stage, a court "may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case." <u>Wexler v. White's Fine Furniture, Inc.</u>, 317 F.3d 564, 574 (6th Cir. 2003) (en banc)). Even if the court were to assume a prima facie case based on timing alone and consider the plaintiff's "other indicia evidence" at the pretext phase, such evidence fails to establish any pretext. See <u>Bryson v. Regis Corp.</u>, 498 F.3d 561, 572 (6th Cir. 2007) ("retaliation claims turn on the employer's motive for discharging the plaintiff").